**DAVID BOYER, OSB 235450**
Email: dboyer@droregon.org
**DISABILITY RIGHTS OREGON**
900 SW 5th Ave., Ste. 1800, Portland OR 97204
Telephone: (971) 219-9320
www.droregon.org

**ALICIA LEDUC MONTGOMERY, OSB 173963**
Email: alicialm@stritmatter.com
**STRITMATTER LAW**
3600 15th Ave. West, #300, Seattle, Washington 98119
Telephone: (206) 448-1777
www.stritmatter.com

**MICHAEL REX, CO 57898,** ***pro hac vice forthcoming***
Email: michael@rex-legal.com
**REX LEGAL**
950 S. Cherry St., Ste. 1515, Denver, Colorado 80246
Telephone: (303) 381-1045
www.rex-legal.com

*Attorneys for Plaintiff Sephiran Roberts*

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**MEDFORD DIVISION**

**SEPHIRAN ROBERTS,**

Plaintiff,

vs.

**JOSEPHINE COUNTY**, an Oregon county and public body, **BRANDI STUBBS**, **DANIEL MILLIGAN**, **JENNIFER ESSICK, MATTHEW RYAN**, **ROBERT SELBY**, **ROBERT DAWLEY, GRACIE SERABIA,** and **DOES 1-4,** individuals.

Defendants.

Case No. 1:26-cv-2448

**COMPLAINT**

Civil Rights Action (42 U.S.C. § 1983) Violations of Fourteenth Amendment – Conditions of Confinement; Failure to Provide Medical Care; Excessive Force; Municipal Liability; Americans with Disabilities Act/Rehabilitation Act; Battery; Negligence

**JURY TRIAL DEMANDED**

## INTRODUCTION

1. The Josephine County jail decided to address Plaintiff Sephiran Roberts's acute mental health crisis by repeatedly locking Mr. Roberts in a full-body straitjacket known as "the Wrap" for eight, and sometimes up to 12, hours a day, denying him meals, and failing to perform sufficient wellness checks while denying his attorney access to Mr. Roberts. The County subsequently destroyed video footage of the conduct.

2. Before Mr. Roberts's detention, the County had notice through the 2018 suicide death of Janelle Marie Butterfield and the resulting litigation of allegations concerning inadequate mental health assessment and care at the jail.

3. Sephiran Roberts entered Josephine County Jail in a psychiatric crisis. During the weeks that followed, jail staff repeatedly immobilized him in a restraint chair or a multipoint device called the Wrap, sometimes securing him to a cart. Restraints were used because the jail lacked even minimal levels of mental health care. For hours at a time, he depended on staff to help him move, eat, and wash. His wrists developed open wounds, his hands became swollen, and he repeatedly complained of pain. Deputies continued returning him to restraints and used electrical shocks, chemical spray, kicks, and punches during encounters in which he was already restrained or under their physical control. The County knew Mr. Roberts needed mental health care. Its own medical staff questioned whether the jail could care for him, its officers documented suicidal statements and conduct, and his attorney repeatedly sought help and was even denied access to her client. Yet prolonged restraint continued, release depended on behavioral compliance during his psychiatric crisis, and the injuries accumulated. The response obstructed his access to meals, hygiene, counsel, and legal documents without reasonable modifications for his disability. Restraint,

seclusion, and disproportionate levels of force became the *de facto* treatment for Mr. Roberts's mental heath crisis.

4. The lawsuit concerns the excessive force, prolonged and injurious restraint, inadequate response to serious medical and mental health needs, and disability discrimination described below. Mr. Roberts seeks damages for the physical and psychological harm caused by the responsible individuals and Josephine County.

**JURISDICTION AND VENUE**

5. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the United States Constitution, 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131–12134, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

6. This Court has supplemental jurisdiction over Plaintiff's Oregon law claims under 28 U.S.C. § 1367 because those claims arise from the same case or controversy.

7. Venue is proper in this District under 28 U.S.C. § 1391(b) because the events giving rise to these claims occurred in Josephine County, Oregon, within this District.

**PARTIES**

8. Plaintiff Sephiran Roberts was a pretrial detainee at the Josephine County Jail during the events alleged in this Complaint.

9. Defendant Josephine County is an Oregon public body that operates the jail through its Sheriff's Office and was responsible for the jail's custodial practice and arrangements for medical and mental health care.

10. Defendant Brandi Stubbs was a jail sergeant who participated in and supervised the response to Mr. Roberts's psychiatric crisis and repeated restraint. She received the contemporaneous notices described below and is sued in her individual capacity.

11. Defendant Daniel Milligan was a jail deputy who personally used the chemical spray and conducted energy devices described below and participated in the restraint management decisions attributed to him. He is sued in his individual capacity.

12. Defendant Jennifer Essick was a jail corporal who personally used a conducted energy device during the November 13 and November 22, 2024 restraint incidents described below. She is sued in her individual capacity.

13. Defendant Matthew Ryan was a jail deputy who personally used force during the November 13 and November 22, 2024 incidents and made decisions concerning continued restraint and access to lunch on December 7, 2024. He is sued in his individual capacity.

14. Defendant Robert Selby was a jail corporal who struck Mr. Roberts on December 6, 2024, and administered the restraint release condition described below. He is sued in his individual capacity.

15. Defendant Robert Dawley was a jail deputy who directed the November 26 restraint, denied the December 19 attorney visit, and performed the December 23 takedown. He is sued in his individual capacity.

16. Defendant Gracie Serabia was a jail deputy who kicked Mr. Roberts's right shin twice during placement in the Wrap on December 6, 2024. Serabia is sued in an individual capacity.

17. Defendant Doe 1 is the jail officer who, on November 9, 2024, held a Taser against Mr. Roberts's upper back and threatened to activate it while Mr. Roberts was restrained and complaining that eating was painful. Doe 1 is sued in an individual capacity.

18. Defendant Doe 2 is the medical professional who assessed Mr. Roberts at approximately 1:00 p.m. on November 13, 2024. Doe 2 is sued in an individual capacity for the assessment and escalation decisions specifically attributed to that person below.

19. Defendant Doe 3 is the medical professional who assessed Mr. Roberts at approximately 2:30 p.m. on November 13, 2024. Doe 3 is sued in an individual capacity for the assessment and escalation decisions specifically attributed to that person below.

20. Defendant Doe 4 is the medical professional who evaluated and treated Mr. Roberts's open wrist wounds on December 6, 2024. Doe 4 is sued in an individual capacity for the failure to address the continuing source of injury alleged below.

21. The individual defendants acted under color of state law. The correctional defendants exercised County custodial authority. Does 2-4 provided jail medical care through the County's arrangements for that care and exercised authority delegated to them in treating detainees. The identities and respective employers of the medical defendants are within the knowledge of the County and its care providers.

## FACTUAL BACKGROUND

### A. The County's Knowledge of Plaintiff's Psychiatric Crisis

22. Before these events, Mr. Roberts had a documented history of serious mental illness, including bipolar I disorder with psychotic features, and had required inpatient psychiatric treatment. His psychiatric impairments substantially limited thinking, concentrating, communicating, emotional regulation, and caring for himself during the

crisis at issue. Before detention, he received outpatient medication management and supportive care through Bridges Community Health.

23. Mr. Roberts was arrested and lodged in the jail on November 8, 2024. He was again arrested and lodged there on November 13, 2024, and remained in the jail into January 2025 before transfer to the Oregon State Hospital.

24. On November 9, 2024, a jail medical provider documented Mr. Roberts' reported attempt to hang himself with a jail issued towel the night before and his subsequent self-injurious and destructive behavior. The provider questioned the jail's ability to care for him, discussed his condition with Lieutenant Ed Vincent, and sought hospital assessment. Mr. Roberts was transported to Rogue Regional Medical Center on a peace officer mental health hold.

25. After his November 13 return, jail personnel observed disorganized speech, apparent mania, suicidal statements, self injury, and difficulty regulating his behavior. They knew he had been prescribed psychiatric medication. That day, Stubbs reported that, across his two admissions since November 8, he had spent "over 50% +/- of his time in the restraint chair or the wrap."

26. The jail provided medication, periodic observations, and some medical assessments and wound care. On November 13, medical staff consulted a prescriber and obtained a medication order. Despite those measures, the psychiatric crisis and repeated injurious restraint continued.

27. On November 20, medical personnel documented that Mr. Roberts heard voices that sometimes instructed him to hurt himself or others and reported a recent suicide

attempt. Staff discussed his presentation with medical supervision and placed him on suicide watch.

28. On November 27, criminal defense attorney Brodia Minter notified Stubbs and Lieutenant Vincent that Mr. Roberts reported prolonged restraint and had been told he would remain on suicide watch indefinitely because no doctor was available to clear him. Stubbs responded that custody staff were not qualified or trained to decide when to remove him from suicide watch and described limitations in access to outside mental health services. She stated that his medications were distributed and monitored through the medical department.

29. Stubbs had direct knowledge of Mr. Roberts's extensive restraint through her participation and supervision, her November 13 report, and counsel's notice. On information and belief, within her responsibility for administering his custody and obtaining access to care, she continued the restrictive response without arranging timely, qualified reassessment sufficient to address the persistent crisis and recurring restraint injuries.

**B. County's Repeated Use of Restraint and Force In Response**

30. The Wrap restricted Mr. Roberts's wrists, shoulders, waist, and legs. The restraint chair likewise substantially restricted movement. On several occasions, staff also secured him to a cart. During extended restraint he depended on staff for safe access to food, hygiene, movement, and medical assistance.

31. On November 9, while Mr. Roberts was in the Wrap and complained that it was painful to eat, Doe 1 held a Taser against his upper back and threatened to activate it unless

he complied. The contact and threat used pain and the prospect of electrical force to obtain compliance from a person already substantially immobilized.

32. On November 13, Mr. Roberts urinated on himself while in the Wrap. When staff removed him for a shower, he was crying and had difficulty walking.

33. After the shower, staff handcuffed Mr. Roberts and escorted him toward the Wrap. Ryan swept his legs and forced him forward. While Mr. Roberts was on the ground, handcuffed, and tensing against staff control, Essick placed a cartridge-free Taser against his right upper back and activated it. She then threatened another application. Stubbs was present.

34. At approximately 1:00 p.m., Doe 2 recorded that Mr. Roberts would remain in the Wrap for an extended period because of his behavior, "per custody." At approximately 2:30 p.m., Doe 3 documented that Mr. Roberts wanted to be released but would remain restrained at custody's direction. The records described threatening and bizarre statements.

35. Medical personnel consulted a prescriber and obtained a medication order on November 13. On information and belief, Does 4 and 5 failed, within their respective assessment and referral responsibilities, to obtain adequate clinical review of the risks and alternatives associated with continued restraint as the psychiatric crisis and painful immobilization persisted. Their respective omissions permitted continued harmful restraint without an adequate response to those risks.

36. On November 22, during another Wrap placement, Ryan used a knee strike to Mr. Roberts's buttocks that pushed his torso forward into a prone position. Essick then applied a Taser to the back of his right arm or shoulder. Officers attributed the force to resistance

during the placement. Mr. Roberts alleges that the degree of force exceeded what was reasonably necessary given the control officers already exercised over him.

37. On November 26, Dawley directed deputies to place Mr. Roberts in the Wrap after control staff reported that he was striking his cell door with his hands and feet. Mr. Roberts complied with commands to submit to handcuffs and kneel. Staff secured him in the Wrap and to a cart.

38. The response began at approximately 9:47 a.m., and Mr. Roberts was not removed until approximately 4:25 p.m., about six hours and thirty-eight minutes later. Dawley reported that Mr. Roberts remained uncooperative throughout the day and that this was why deputies did not remove him sooner. The continued immobilization relied on behavioral compliance without adequate individualized reassessment of the need for that degree and duration of restraint.

39. On December 1, while Mr. Roberts was in a restraint chair, Milligan applied a Taser in drive-stun mode to his left shoulder while officers attempted to re-secure his arm. Staff documented a visible injury at the Taser contact site. Milligan and Selby then decided not to continue exercising Mr. Roberts's remaining limbs because of asserted safety concerns. Mr. Roberts remained restrained.

40. On December 6, Milligan sprayed OC into Mr. Roberts's face twice while he was inside his cell. Officers described him as striking the door, making nonsensical statements, and refusing commands during an encounter involving his meal tray. Milligan observed that Mr. Roberts's hands were already swollen.

41. Deputies handcuffed Mr. Roberts and escorted him into the hallway to place him in the Wrap. He said he did not want to return to the device. As he leaned backward and

tensed against officers' efforts to force him down, Serabia kicked his right shin twice; Milligan applied a Taser in drive-stun mode; and Selby delivered repeated closed-fist blows to the back of his right shoulder. Other officers described four to five blows. Selby estimated using approximately eighty percent of full strength.

42. Multiple officers were already exercising physical control over the handcuffed Mr. Roberts during this use of force. They secured him in the Wrap and cart and used cool, wet towels on his face. Selby conditioned removal from the Wrap on "Cool, calm, collected behavior." Medical personnel later treated his injuries.

43. On December 7, staff placed Mr. Roberts in the Wrap at approximately 4:10 a.m. He remained restrained until approximately 4:45 p.m., about twelve hours and thirty-five minutes. Ryan participated in the decisions to continue restraint, reporting that Mr. Roberts's yelling, hostility, and lack of cooperation made Ryan unwilling to remove him.

44. At lunch, Ryan decided neither to release an arm nor have staff feed Mr. Roberts. Ryan cited the risk of grabbing staff or equipment, removing restraints, and spitting. Staff set the lunch aside until Mr. Roberts became more cooperative. They did not provide that meal or a replacement after his release because the tray had been left out too long. He received dinner.

45. Ryan continued the immobilization and withheld lunch without arranging a safe method of assistance or adequate reassessment of whether less restrictive measures could address the specific risks. The resulting prolonged restraint and missed meal caused additional pain, hunger, and distress.

46. On December 11, after Mr. Roberts was already in the Wrap and cart, Milligan pressed a Taser against his right shoulder and activated it in drive-stun mode after staff

reported that Mr. Roberts had spat through a spit hood. The electrical force was applied while his movement was already severely restricted.

47. Chemical spray and extended restraint recurred. On December 15, staff sprayed Mr. Roberts and placed him in the Wrap; the incident account records an opportunity to decontaminate when he was removed more than six hours later. On December 21, Deputy Zacha deployed OC twice before staff placed Mr. Roberts in the Wrap and cart and used wet towels on him. Mr. Roberts missed breakfast, and no replacement was provided after the saved tray became unavailable. Staff used OC and placed him in the Wrap again on January 3, 2025.

48. On December 23, Dawley, Corporal Humphfres, and Deputy Dahlberg escorted Mr. Roberts from an in-house court appearance. He had become upset, refused an initial direction to leave, and used the courtroom microphone. At the courtroom door, he removed a borrowed shirt and threw it aside. Dawley took control of his left arm; the officers reported that Mr. Roberts pulled away.

49. While holding Mr. Roberts's left arm, Dawley deliberately tripped Mr. Roberts and pulled his body to the side, taking him to the floor. Dawley and Humphfres landed on him, and staff then handcuffed him. Mr. Roberts sustained a cut near his left eyebrow and required cleaning and treatment. The takedown imposed force disproportionate to the resistance and threat presented in that controlled setting.

50. On January 16, 2025, staff again secured Mr. Roberts in the Wrap during the late afternoon. He remained restrained through shift change until approximately 2:00 a.m. on January 17, when staff described him as calm and collected.

**C. Plaintiff's Recurring Injuries and Unmet Need for Reassessment**

51. The restraint injuries were recurring and visible. On November 27, medical personnel documented an approximately two centimeter left wrist laceration after Mr. Roberts reported injury from restraint the day before. On November 29, the wound remained open, red, and swollen. On December 4, medical staff documented continuing wrist abrasions and new knee abrasions following another Wrap restraint.

52. On December 6, Doe 4 documented open areas on both wrists from pulling against cuffs and provided wound care. On information and belief, Doe 4 knew the injuries arose during repeated restraint but did not obtain reassessment of the restraint and care plan or escalate the continuing injury risk to a clinician with authority to address it. Treating the wounds without addressing that known source of recurring injury allowed additional avoidable pain and injury.

53. Medical staff cleaned, treated, and dressed wounds on several occasions. Some areas later scabbed and healed, while repeated restraint caused or aggravated pain and injury. On December 16, Mr. Roberts complained that the restraints hurt his right wrist but remained in the Wrap and cart.

54. During a December 16 evaluation, forensic evaluator Dr. Claudia Lake observed sores around Mr. Roberts's wrists and arms in different stages of healing, markedly swollen hands, and poor hygiene. In her December 27 report, she concluded that he lacked competency and required hospital-level competency restoration treatment. She found no evidence that he was exaggerating or malingering.

55. The recurring wounds, pain complaints, psychiatric presentation, and continued need for restrictive custody made the inadequacy of the existing response apparent. Reasonably available measures included qualified psychiatric reassessment, review of the necessity and

manner of restraint, adjustment of the care plan, and escalation to a higher level of care when needed.

**D. County's Barriers to Attorney Access and Basic Services**

56. Attorney Minter repeatedly sought access to Mr. Roberts to confer about his pending criminal cases and obtain necessary records authorizations and signatures. She notified Stubbs and Lieutenant Vincent when jail restrictions prevented access and requested arrangements that would allow the visits and document review.

57. On the morning of December 3, jail staff denied Minter an in-person visit with Roberts for asserted safety reasons. A visit occurred later that day. On December 4, her staff again encountered a refusal to bring Mr. Roberts to the attorney booth to review and sign documents, and Minter requested that arrangements be made for their return.

58. On December 5, staff temporarily removed Mr. Roberts from the Wrap to sign a medical records authorization. He read the form slowly aloud and did not complete it. Staff treated the interaction as uncooperative, ended the signing effort, and returned him to restraints after an encounter involving reported threats and resistance. They did not arrange an effective, disability-responsive way for him to complete the authorization.

59. On December 19, Dawley and Dahlberg approached Mr. Roberts concerning an attorney visit. After he exposed himself, Dawley told control the visit would not occur because of inappropriate behavior. The decision prevented the visit rather than arranging a safe alternative responsive to his psychiatric impairment.

60. Mr. Roberts's psychiatric symptoms impaired his communication, attention, and behavioral regulation. Those limitations were apparent to staff and were repeatedly brought to their attention. On information and belief, feasible modifications included paced

communication and additional time, counsel-assisted document review through a secured visit, modified contact or scheduling, and supervised assistance with food and hygiene while protective restraints remained necessary.

61. The County's personnel responsible for these services did not adequately assess or provide those modifications. They repeatedly conditioned access on ordinary behavioral compliance despite the known limitations affecting Mr. Roberts's ability to meet that condition. Staff consistently failed to make reasonable modifications for his known mental health condition. These decisions delayed consultation and document review and deprived him of access to basic services during restraint.

**E. County's Prior Notice of Insufficient Mental Health Services**

62. Josephine County jail had notice that its mental health services were not sufficient to support the medical and mental health needs of adults in custody experiencing severe mental illness or psychiatric crisis.

63. In September 2018, adult in custody Janelle Marie Butterfield died by suicide in the Josephine County jail, resulting in a federal lawsuit, *Dence v. Wellpath, LLC*, No. 1:20-cv-00671-CL. The estate alleged a known history of mental illness and suicidality, the County's use of a Taser and restraint chair, and failures to provide mental health assessment and care before her death.

64. The County participated in that litigation before Mr. Roberts's detention. The prior death and the allegations against the County and its officials gave them notice of the danger of managing psychiatric crisis through restrictive custody without an adequate system for obtaining mental health care. Despite that notice, the recurring failures alleged here persisted during Mr. Roberts's detention.

65. On information and belief, the County maintained recurring practices of using prolonged Wrap, chair, and cart restraint to manage psychiatric crises; making release from restraint depend on generalized cooperation without adequate individualized reassessment; and continuing restrictive custody without an effective process to secure the clinical intervention, injury prevention, and basic services the detainee required.

66. These practices operated across different officers and shifts over multiple weeks. They are reflected in Stubbs's early description of extensive restraint, Dawley's and Ryan's stated reasons for continuation, Selby's behavioral release condition, the repeated injuries and missed meals, and the November 27 acknowledgment of barriers to qualified mental health decision-making.

67. County supervisors received contemporaneous notice while the practices continued. Stubbs knew the frequency of restraint and received counsel's concerns. Minter also notified Lieutenant Vincent. On information and belief, County officials responsible for jail policy, training, and supervision knew of the risks through, at least, the earlier Butterfield death and litigation and the jail's reports and communications concerning Mr. Roberts, yet failed to correct the recurring deficiencies.

**F. Plaintiff's Injuries**

68. Defendants' above conduct caused or aggravated Mr. Roberts's wrist and arm wounds, abrasions, swelling, Taser contact injury, facial laceration, and physical pain. The prolonged restraints and denial of basic needs caused additional discomfort and distress.

69. Mr. Roberts also suffered fear, humiliation, mental anguish, and aggravation of his psychiatric distress. These injuries impaired his wellbeing and enjoyment of life. He seeks recovery for harm caused or aggravated by Defendants' conduct.

**G. Oregon Tort Claims Act Notice**

70. On May 7, 2025, Plaintiff, through counsel, emailed written notice of his tort claims to Josephine County, County Counsel Wally Hicks, and Josephine County Sheriff's Office, including Sheriff Dave Daniel. A hard copy was also mailed that day.

71. On May 8, 2025, Sheriff's Office Executive Assistant Kelcie Easter forwarded counsel's notice to Sheriff Dave Daniel, Travis Snyder, and Sergeant Stubbs.

72. Plaintiff satisfied the notice requirements of ORS 30.275 for his Oregon law claims against Josephine County and its officers, employees, and agents.

**FIRST CLAIM FOR RELIEF**

**42 U.S.C. § 1983 — Fourteenth Amendment**

**Unconstitutional Conditions of Confinement and Prolonged, Injurious Restraint**

**(Against Defendants Stubbs, Essick, Ryan, Milligan, Selby, Dawley, and Does 1-4)**

73. Plaintiff realleges paragraphs 1 through 72.

74. While Plaintiff was a pretrial detainee, Defendants Stubbs, Essick, Ryan, Milligan, Selby, Dawley, and Doe Defendants, acting under color of state law, intentionally made or implemented the particular restraint, release, nutrition, and access-to-care decisions attributed to them below.

75. The challenged decisions include:

a. Repeated extended immobilization in the Wrap, restraint chair, and cart;

b. Continuation of painful restraint despite recurring wrist wounds, swelling, and complaints of pain;

c. Reliance on generalized cooperation or "cool, calm, collected" behavior as a condition of release without adequate individualized reassessment of continuing danger; and

d. Failure to arrange safe access to meals and hygiene during extended restraint.

76. The personal participation of the Defendants includes:

a. Dawley's direction of the November 26 restraint and continuation of that restraint based on generalized noncooperation;

b. Essick's restraint decisions described in the November incidents;

c. Ryan's December 7 decisions to continue restraint and not to release an arm or provide assisted feeding at lunch, after which the withheld meal was not replaced;

d. Milligan's and Selby's December 1 decision to discontinue further limb exercise while Plaintiff remained restrained;

e. Selby's December 6 administration of "Cool, calm, collected behavior" as a condition for release from the Wrap;

f. Stubbs's participation in and administration of the recurring restrictive response, despite her direct knowledge of the frequency of restraint and contemporaneous notice of Plaintiff's continuing psychiatric needs; and

g. The participating Doe Defendants' decisions to impose, continue, or decline to modify restraint during the episodes attributed to them.

77. These conditions exposed Plaintiff to a substantial risk of serious physical and psychological harm, including painful immobilization, recurrent and aggravated restraint wounds, swelling, and worsening psychiatric distress.

78. Reasonable officials in each participating Defendant's circumstances would have appreciated the high degree of risk from Plaintiff's visible and documented injuries, pain complaints, repeated restraint episodes, psychiatric presentation, and the information communicated during his confinement. The consequences of continuing the challenged conditions without an adequate response were obvious.

79. The Defendants failed to take reasonable available measures within their respective authority to abate that risk, including:

a. Obtaining meaningful clinical reassessment;

b. Reassessing the current necessity, fit, and duration of restraint;

c. Modifying or ending restraint when continued immobilization was no longer justified;

d. Arranging safe assistance with meals and hygiene; and

e. Obtaining higher level medical or mental health intervention when the existing response was failing.

80. The challenged failures were objectively unreasonable and amounted to a reckless disregard of an obvious substantial risk.

81. Alternatively, the continued restraints and associated restrictions constituted impermissible punishment because, in the circumstances alleged, their severity and duration were excessive in relation to legitimate protective and security purposes.

82. Each participating Defendant's own decisions and unreasonable omissions caused or prolonged the harmful conditions attributed to that Defendant and were actual and proximate causes of Plaintiff's resulting pain, restraint injuries, and psychological harm.

83. Plaintiff seeks compensatory damages; nominal damages; punitive damages against the individual Defendants for malicious conduct or reckless or callous disregard of his federal rights; and reasonable attorney fees and costs under 42 U.S.C. § 1988.

**SECOND CLAIM FOR RELIEF**

**42 U.S.C. § 1983 — Fourteenth Amendment**

**Failure to Provide Adequate Medical and Mental Health Care**

**(Against Defendant Stubbs and Does 2, 3, and 4)**

84. Plaintiff realleges paragraphs 1 through 72.

85. While in the jail, Plaintiff had serious medical and mental health needs, including an acute psychiatric crisis with psychotic symptoms, suicidal statements and conduct, and recurrent painful wounds and swelling associated with repeated restraint. Without an adequate response, these conditions presented a substantial risk of serious harm.

86. Each Defendant against whom this claim is asserted acted under color of state law and intentionally made the particular assessment, referral, restraint-related clinical, or access-to-care decisions attributed to that Defendant.

87. The medical Doe Defendants against whom this claim is asserted are Doe 2 for the approximately 1:00 p.m. November 13 assessment and escalation decisions, Doe 3 for the approximately 2:30 p.m. November 13 assessment and escalation decisions, and Doe 4 for the December 6 wound assessment and escalation decisions. Plaintiff challenges each Defendant's own response to the continuing risks apparent at that encounter.

88. Defendants unreasonably failed to reassess and escalate the response when those measures did not adequately address his continuing psychiatric deterioration and repeated injurious restraint. Plaintiff challenges each Defendant's failure, within that Defendant's

responsibilities and reasonable opportunity to act, to obtain adequate reassessment or escalation when the continuing psychiatric crisis and recurring restraint injuries made the inadequacy of the existing response apparent.

89. The challenged omissions include:

a. Failing to obtain timely, adequate psychiatric reassessment and an appropriate higher level of intervention in response to persistent crisis and repeated self-harm;

b. Failing to arrange qualified clinical review of continued suicide watch and restraint needs rather than allowing restrictions to continue without meaningful reassessment; and

c. Failing to address the recurring source of restraint injuries when repeated wound care did not prevent further painful injury.

90. Plaintiff challenges each omission only as to Defendants with responsibility and a reasonable opportunity to take the relevant action.

91. Stubbs had contemporaneous notice of Plaintiff's extensive restraint and psychiatric needs through her own involvement and the communications described above. Her November 27 response acknowledged that custody staff were not qualified to make the clinical determination necessary to end suicide watch and described limitations in access to outside mental health services. Within her custodial and supervisory responsibilities, she failed to facilitate timely qualified reassessment and coordinate an adequate response to the continuing risks described above. Plaintiff does not allege that Stubbs personally had authority to diagnose, prescribe medication, or order hospital admission.

92. A reasonable medical or custody official in each Defendant's position would have appreciated the high degree of risk from the circumstances known or apparent to that Defendant, including repeated self-injury, psychotic presentation, recurrent wounds, pain, and the failure of the existing response to resolve the crisis.

93. Reasonable available measures included prompt escalation to qualified clinicians, reassessment of the care and restraint plan, and steps within the Defendant's authority to facilitate necessary hospital level evaluation or treatment.

94. Despite those circumstances, Defendants failed to take reasonable available measures to abate the risk. Their conduct was objectively unreasonable and reflected reckless disregard of an obvious substantial risk.

95. Each Defendant's challenged decisions or omissions caused an avoidable continuation or aggravation of Plaintiff's psychiatric distress, physical pain, or restraint-related injury.

96. Plaintiff seeks compensatory damages; nominal damages; punitive damages against individual Defendants for malicious conduct or reckless or callous disregard of his federal rights; and reasonable attorney fees and costs under 42 U.S.C. § 1988.

**THIRD CLAIM FOR RELIEF**

**42 U.S.C. § 1983 — Fourteenth Amendment**

**Excessive Force**

**(Against Defendants Essick, Ryan, Milligan, Selby, Serabia, Dawley, and Doe 1)**

97. Plaintiff realleges paragraphs 1 through 72.

98. At all relevant times, Plaintiff was a pretrial detainee entitled to protection under the Due Process Clause of the Fourteenth Amendment.

99. Each Defendant against whom this claim is asserted acted under color of state law.

100. These Defendants purposely or knowingly applied or directed physical force against Plaintiff.

101. The challenged use of force includes:

a. Doe 1's physical application of a Taser against Plaintiff's upper back during the November 9, 2024 encounter, accompanied by a threat to activate it;

b. Ryan's leg sweep and Essick's drive stun application during restraint placement on November 13, 2024;

c. Ryan's knee strike and Essick's Taser application during restraint placement on November 22, 2024;

d. Milligan's drive-stun applications on December 1, 6, and 11, 2024, and his two OC deployments on December 6, 2024;

e. Selby's repeated closed-fist blows and Serabia's two kicks to Plaintiff's right shin on December 6, 2024; and

f. Dawley's deliberate trip and takedown on December 23, 2024.

102. The force used was objectively unreasonable in light of the circumstances confronting each participating Defendant, including Plaintiff's existing restraints, the number of officers exercising control over him, the nature and immediacy of the threat, the extent of any resistance, the severity of the force used, his evident psychiatric crisis, his existing injuries, and the opportunity to temper or discontinue force.

103. The force was disproportionate to the immediate threat or resistance, including painful electrical applications and repeated strikes during encounters in which officers already substantially controlled his movement.

104. The particular force used exceeded what was objectively reasonable at the time of its application, including after the need for that degree of force had diminished.

105. Defendants' conduct violated Plaintiff's clearly established right to be free from objectively unreasonable force as a pretrial detainee.

106. As a direct and proximate result, Plaintiff suffered physical pain, wounds, abrasions, swelling, and emotional and psychological injury, including aggravation of his psychiatric distress.

107. Plaintiff seeks compensatory damages in an amount to be proved at trial, nominal damages if a constitutional violation is established without compensable injury, punitive damages against individual Defendants whose conduct was malicious or in reckless or callous disregard of his federally protected rights, and reasonable attorney fees and costs under 42 U.S.C. § 1988.

**FOURTH CLAIM FOR RELIEF**

**Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, and**

**Section 504 of the Rehabilitation Act, 29 U.S.C. § 794**

**Disability Discrimination and Failure to Make Reasonable Modifications**

**(Against Defendant Josephine County)**

108. Plaintiff realleges paragraphs 1 through 72.

109. Plaintiff was a qualified individual with a disability. His bipolar disorder with psychotic features and associated psychiatric impairments substantially limited major life activities, including thinking, communicating, concentrating, and caring for himself. With reasonable modifications, he was otherwise qualified to receive the jail services and benefits at issue.

110. Josephine County is a public entity subject to Title II.

111. On information and belief, the Josephine County department or agency operating the jail received federal financial assistance during the relevant period, and its operations were a program or activity subject to Section 504.

112. The services and benefits at issue included attorney visitation and legal document review and execution, access to meals and hygiene during protective custody, and meaningful access to the jail's assessment and protective custody processes.

113. Plaintiff's disability impaired his ability to communicate, complete document review tasks, and satisfy generalized behavioral compliance requirements during his psychiatric crisis.

114. The County had actual notice of Plaintiff's disability and accommodation needs through staff observations, medical information, repeated crisis and restraint episodes, and communications from counsel. His need for modification was also obvious in the circumstances described above. The County nevertheless treated disability-related communication and behavioral limitations as grounds to withhold or terminate access without adequately investigating effective modifications.

115. Reasonable modifications could have included additional time and simplified, paced communication for legal document review; counsel assisted review and signing through a secured or otherwise modified visit; individualized consideration of disability-related limitations in applying behavioral access and restraint release criteria; and safe assistance with meals and hygiene when protective restraints prevented Plaintiff from accessing those services himself. On information and belief, these modifications were

feasible without fundamentally altering the services or requiring the County to ignore a genuine, immediate safety threat.

116. The County failed to provide these reasonable modifications or an effective alternative. In the document signing and attorney access incidents described above, it ended or withheld access based on conduct reflecting Plaintiff's psychiatric impairment without an adequate individualized inquiry into a safe, accessible method. During extended restraint, it failed to modify the means of providing basic services when Plaintiff could not access them in the ordinary manner.

117. By reason of his disability, Plaintiff was denied meaningful access to these services and subjected to discrimination under Title II.

118. As to Section 504, Plaintiff alleges that the identified accommodation denials excluded him from meaningful access solely by reason of disability: the County failed to modify disability-related barriers to services for which he was otherwise qualified. This claim does not allege that inadequate medical treatment alone constitutes disability discrimination or that every safety restriction was discriminatory.

119. County personnel responsible for administering the identified services had notice of Plaintiff's disability-related access needs through the circumstances and communications described above. Stubbs received counsel's requests concerning access and document review; Dawley personally denied the December 19 attorney visit; and Ryan personally decided not to provide lunch or assisted feeding on December 7. The responsible personnel knew that failure to investigate or provide appropriate modifications was substantially likely to deny him meaningful access, yet deliberately failed to investigate or provide effective modifications or alternatives within their respective authority.

120. The accommodation failures caused loss of meaningful access, unnecessary continuation of restrictive conditions, and resulting injury.

121. Plaintiff seeks compensatory damages to the extent recoverable under each statute and supported by proof, together with reasonable attorney fees, litigation expenses, and costs under 42 U.S.C. § 12205 and 29 U.S.C. § 794a(b).

**FIFTH CLAIM FOR RELIEF**

**42 U.S.C. § 1983 — *Monell* Municipal Liability**

**(Against Defendant Josephine County)**

122. Plaintiff realleges paragraphs 1 through 72.

123. Josephine County operated the jail and acted under color of state law.

124. The constitutional violations involving excessive restraint, harmful conditions of confinement, and inadequate medical and mental health care were caused by the County's own customs, policies, practices, and deliberately indifferent omissions.

125. Josephine County maintained the recurring operational practices described in paragraphs 63–69 and specified below. Those practices, and the deliberately indifferent failure to correct their identified deficiencies, caused Plaintiff's constitutional injuries.

126. On information and belief, the County maintained persistent practices of managing detainees in psychiatric crisis through repeated extended use of the Wrap, restraint chair, and cart without adequate clinical reassessment of continued necessity; using generalized behavioral compliance as a release criterion without adequate consideration of psychiatric impairment; and continuing restrictive suicide watch and restraint management without an effective process for obtaining the qualified mental health intervention necessary to reassess those restrictions.

127. The basis for alleging these practices includes the repeated episodes over multiple weeks involving different officers and shifts, the recurring behavioral release criteria in the reports, the documented recurrence of restraint injuries, Stubbs's November 13 description of Plaintiff's extensive restraint, and the November 27 correspondence acknowledging the gap in qualified mental health decision-making. These allegations describe recurring operational practices rather than a municipal custom inferred solely from a single officer's isolated act.

128. The practices were accompanied by inadequate safeguards governing restraint duration and release, clinical escalation when injuries or psychiatric deterioration persisted, and access to meals and hygiene during extended immobilization. The County continued the challenged operational response after contemporaneous notice through supervisory personnel of Plaintiff's repeated restraint, injuries, and unmet need for qualified reassessment.

129. Alternatively, on information and belief, the County's training and supervision were deficient in the specific areas implicated by these recurring practices: reassessment and release from extended restraint during psychiatric crisis, recognition and escalation of continuing restraint injury, and obtaining qualified mental health review when custody staff could not make the required clinical decisions.

130. The repeated incidents and contemporaneous notices alleged above placed the County on notice of the substantial risk that continuation of these deficiencies would cause constitutional injury, yet it failed to take reasonable corrective action.

131. The County's deliberate choices and omissions created an obvious risk that detainees experiencing psychiatric crisis would be subjected to prolonged and injurious

restraint, harmful conditions of confinement, and inadequate medical and mental health care.

132. The County's continuation of these customs and its deliberate failure to correct the identified deficiencies constituted deliberate indifference to the known or obvious risk of constitutional injury.

133. These municipal practices and omissions were moving forces behind the violation of Plaintiff's constitutional rights and resulting injuries: they prolonged injurious restraint, substituted repeated custodial restriction for adequate reassessment, and allowed the harmful cycle to continue after notice.

134. As a direct and proximate result, Plaintiff suffered physical pain, wounds, swelling, and emotional and psychological injury.

135. Plaintiff seeks compensatory damages; nominal damages; and reasonable attorney fees and costs under 42 U.S.C. § 1988.

## SIXTH CLAIM FOR RELIEF

### Negligence

### (Against Defendant Josephine County)

136. Plaintiff realleges paragraphs 1 through 72.

137. By taking and maintaining custody of Plaintiff, Josephine County had a special custodial relationship with him and owed him a duty to exercise reasonable care for his safety and basic needs, including safe restraint, adequate monitoring, food, hygiene, and access to necessary medical and mental health care.

138. The County's conduct created a foreseeable risk of physical harm when it repeatedly immobilized a person experiencing psychiatric crisis and dependent on staff for protection, reassessment, food, hygiene, and access to care.

139. Through its officers, employees, and agents, the County breached that duty by failing to reasonably assess and reassess the necessity, fit, and duration of restraints; adjust restraint practices in response to recurring wounds, swelling, and pain; provide adequate monitoring and safe access to meals and hygiene; and timely obtain and coordinate qualified assessment and intervention for Plaintiff's persistent psychiatric crisis.

140. Physical injury and psychiatric aggravation were reasonably foreseeable consequences of these failures given Plaintiff's evident psychiatric condition, repeated restraint episodes, documented injuries, complaints of pain, and communications to staff.

141. The responsible officers, employees, and agents acted within the course and scope of their County employment and duties in maintaining custody, managing restraint, providing access to care, and furnishing basic services.

142. The County is liable for their negligence under ORS 30.265.

143. The County's breaches were actual and proximate causes of Plaintiff's physical pain, wounds, abrasions, swelling, emotional distress, mental anguish, and loss of enjoyment of life.

144. Plaintiff seeks compensatory damages for physical pain, emotional distress, mental anguish, and loss of enjoyment of life caused by Defendants' conduct, in amounts to be proved at trial.

## SEVENTH CLAIM FOR RELIEF

### Battery

### (Against Defendant Josephine County)

145. Plaintiff realleges paragraphs 1 through 72.

146. County officers, employees, and agents intentionally caused harmful or offensive physical contact with Plaintiff through the OC deployments, Taser applications, strikes, forcible restraints, and courtroom takedown identified in the factual allegations.

147. The challenged contacts were unprivileged because the nature, degree, or duration of the force exceeded what was reasonably necessary under the circumstances.

148. The responsible officers, employees, and agents acted within the scope of their County employment or duties. Josephine County is liable for their conduct under ORS 30.265.

149. The challenged contacts were actual and proximate causes of Plaintiff's physical pain, wounds, abrasions, swelling, and emotional and psychological injury.

150. Plaintiff seeks compensatory damages for physical pain, emotional distress, mental anguish, and loss of enjoyment of life caused by Defendants' conduct, in amounts to be proved at trial.

## DEMAND FOR JURY TRIAL

151. Plaintiff demands a trial by jury on all issues so triable.

///

///

///

///

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the Court enter judgment in his favor and award:

1. Compensatory damages, including economic and non-economic damages, in amounts to be proved at trial;

2. Nominal damages for established constitutional violations for which compensatory damages are not proved;

3. Punitive damages against the individual Defendants under 42 U.S.C. § 1983 whose conduct was malicious or in reckless or callous disregard of Plaintiff's constitutional rights;

4. Reasonable attorney fees, litigation expenses, and costs to the extent authorized under 42 U.S.C. § 1988 and 12205, 29 U.S.C. § 794a(b), and other applicable law;

5. Pre-judgment and post-judgment interest as permitted by law; and

6. Such other and further relief as the Court deems just and proper.

DATED: November 6, 2026

Respectfully submitted,

**STRITMATTER LAW**

By: *s/Alicia LeDuc Montgomery*
**ALICIA LEDUC MONTGOMERY, OSB #173963**
Email: alicialm@stritmatter.com
3600 15th Ave. West, #300, Seattle, Washington 98119

**DAVID BOYER, OSB 235450**
Email: dboyer@droregon.org
**DISABILITY RIGHTS OREGON**
900 SW 5th Ave., Ste. 1800, Portland OR 97204

**MICHAEL REX, CO 57898, *pro hac vice forthcoming***
Email: michael@rex-legal.com
**REX LEGAL**
950 S. Cherry St., Ste. 1515, Denver, Colorado 80246

*Attorneys for Plaintiff Sephiran Roberts*